569 So.2d 1181 (1990)
Andrean Len Cook WHITE
v.
Elva M. THOMPSON, Edward J. Thompson and Lance David White.
No. 89-CA-0061.
Supreme Court of Mississippi.
October 17, 1990.
Rehearing Denied November 28, 1990.
*1182 Elizabeth L. Gilchrist, Jackson, for appellant.
John Gordon Roach, Jr., Roach & McMillan, McComb, for appellees.
Before DAN M. LEE, P.J., and ANDERSON and PITTMAN, JJ.
PITTMAN, Justice, for the Court:
Lance David White, his mother, Elva Thompson, and his stepfather, Edward Thompson, filed suit in Pike County Chancery Court, alleging that David's wife Andrean, who had custody of the couple's two children, was an unfit parent, and asking the court to place the children in the custody of the Thompsons. The court found in favor of the Thompsons and granted them custody of the children. The court also placed certain restrictions on Andrean's visitation privileges. Andrean White appeals from the judgment of the chancery court. Finding no error, we affirm.

FACTS
David and Andrean (An) White were married on December 24, 1983. They have two children: David Keith, almost four years old at the time of the hearing in this cause; and Joseph Lee, seventeen months at that time. The Whites' marriage has been an unstable one, including frequent moves, separations, drinking problems (David), and infidelity (both parties). After time spent in Texas and California the Whites eventually returned to McComb, Mississippi. They reconciled in October 1987, and moved into a trailer procured by An's father and placed on property owned by Elva and Ed Thompson, mother and stepfather of David White. In December 1987, while working at Servicemaster Professional Cleaning, An met Phyllis Hasberger, a co-worker at Servicemaster. Phyllis and her son Joshua visited with the Whites, and eventually moved into their trailer with them. About three weeks after Phyllis and Joshua moved in, An and David's marriage had deteriorated to the point where An asked David to leave, and he did. Neither has filed any kind of divorce proceeding. Two to three weeks after David moved out, An and Phyllis began having sexual relations. With both working, caring for the children proved to be difficult, and An attempted to work out something at Servicemaster so that only one of them would have to work. Eventually, both were terminated. In April 1988, An found work as a cashier for Charter Marketing, a convenience store. An quit this job after approximately three months, blaming her employer and the lawsuit at bar.
On May 25, 1988, David White and the Thompsons filed a complaint in the Pike County Chancery Court against An White, alleging that An had used marijuana in the presence of her children, had neglected the children's health and well-being, and had conducted herself in an immoral manner with Phyllis Hasberger so that An had become unfit to keep custody of her children. The Thompsons asked that custody of Keith and Joseph be given to them and that An White be ordered to pay child support to them. The Thompsons also alleged that An planned to take the children to Nebraska or to some other out-of-state destination, and asked the chancery court for a temporary restraining order to prevent this.
In late May, shortly after the complaint was filed, David White came by the trailer. He suggested that he take the children out to eat and then keep them overnight. An agreed. The next day David's girlfriend came by the trailer to pick up some extra *1183 clothes for the children, which An gave to her. David did not return the children to An and An did not know of their whereabouts for about a week. David instead delivered the children to the Thompsons at his mother's request. Shortly after this An answered the complaint, denied the allegations, and counterclaimed, alleging that the Thompsons had taken her children from her without her consent, and asked that the children be returned and that David White be ordered to pay child support. Subsequently An and Phyllis moved out of the trailer.
The hearing in this cause was held on June 29 and August 11, 1988. At the time of the hearing An White had no job or assets. She and Phyllis were living with Phyllis's uncle near Wesson, Mississippi. She admitted that she and Phyllis had used marijuana while the children were at the trailer, either outside or in their room. She also testified that she sometimes slept until 11 a.m., and the children would already be outside, unsupervised, by that time. An admitted to two affairs during her marriage, the most recent of which she had broken off shortly before she had met Phyllis. There was conflicting testimony about the children being outdoors during cold weather with inadequate clothing, about them being sick as a result, and about them going hungry. An testified that she thought her relationship with Phyllis was a good one, that it wasn't harmful to her children, and she didn't feel that she had to break it off because it was repugnant to her in-laws. According to An, the living conditions at the trailer were a lot better than when David had lived there, and there had never been any complaints from anyone about how she was raising her children until she began her relationship with Phyllis. She also claimed, with corroboration from witnesses, that the behavior of her children had gotten worse during their stay with the Thompsons.
Edward and Elva Thompson testified that they loved their grandchildren and were able to provide a stable home for them. The Thompsons felt that the childrens' health and behavior had improved during their stay with them. They agreed that David White should not have custody due to his financial situation and his drinking problem.
The chancellor found that An White was unfit, morally and otherwise, to have custody of her children. The court vested custody in the Thompsons and ordered that An White should pay $150.00/month child support to the Thompsons beginning thirty days after she obtained employment. The court provided for visitation for An White, but ordered that the visitation be held outside the presence of Phyllis Hasberger, and also found that An White should not be allowed to take the children out of the state without the prior written consent of the Thompsons. David White was also found to be unfit for custody, and was ordered to pay support of $150.00/month.

I.
An White argues that the chancellor found her unfit solely because of her lesbian relationship, and that other factors relied on by the chancellor were never determined to have had any kind of adverse effect on her children. The chancellor found that "[t]here's substantial evidence of neglect in the record" and that An White was "unfit, morally and otherwise to have custody at this time of these two children of such tender years." (emphasis added). The chancellor relied on Mrs. White's financial situation, her past adulterous behavior, her marijuana use, and the lesbian relationship. He did not mention the allegations concerning the children's health, their going hungry, and lack of parental supervision.
This Court has recognized that "the natural parents of children have the natural right to the nurture, care and custody of their children." Simpson v. Rast, 258 So.2d 233, 236 (Miss. 1972). In a custody dispute between a natural parent and third parties, such as grandparents,
it is presumed that the best interests of the child will be preserved by it remaining with its parents or parent. In order to overcome this presumption there must be a clear showing that the parent has (1) *1184 abandoned the child, or (2) the conduct of the parent is so immoral [as] to be detrimental to the child, or (3) the parent is unfit mentally or otherwise to have the custody of his or her child.
Rodgers v. Rodgers, 274 So.2d 671, 673 (Miss. 1973); see also Milam v. Milam, 509 So.2d 864, 866 (Miss. 1987) (citing Rodgers). Put another way,
[t]he paternal grandparents have no right to the custody of their grandson, as against the mother, until they have charged and proved that she has forfeited her natural right to the custody of her minor son by abandonment or by immoral conduct, or other circumstances which clearly indicate that the best interest of the child will be served in the custody of another.
Pace v. Barrett, 205 So.2d 647, 649 (Miss. 1968). "Children are not to be taken from the parents and given to some other person simply because the third person is more able financially to give the child a greater advantage in life." Simpson, 258 So.2d at 236; see also Robinson v. Robinson, 481 So.2d 855 (Miss. 1986) (fact that mother was participant in federal and state social service programs did not disqualify her from having custody). That a custodial parent may wish to take his or her child out of the state is insufficient reason to deprive the parent of custody, absent the determinations discussed above. Turner v. Turner, 331 So.2d 903, 905-906 (Miss. 1976).
An White argues that her conduct was not shown to have had any detrimental effect on her children, and, relying on Carr v. Carr, 480 So.2d 1120 (Miss. 1985), and the authority cited earlier, maintains that such detrimental effect cannot be presumed but must be shown. Carr, which involved a custody fight incident to a divorce action, is similar to the case at bar in several respects. Despite finding that both parties were fit and suitable parents to have custody, the chancellor awarded the minor children to the father "because of the long standing continued adulterous relationship of Mrs. Carr." Carr, 480 So.2d at 1121. This Court stated in Carr:
[The] moral fitness of a parent encompasses the charge of adultery. But moral fitness is but one factor to be considered, and it is a factor worthy of weight in determining the best interest of the child. Adultery of a parent may be an unwholesome influence and an impairment to the child's best interest, but on the other hand, may have no effect. The trial court should consider this factor along with all others when making original custody determinations.
Carr, 480 So.2d at 1123. This Court looked to the record and to the chancellor's analysis, and despite the fact that the chancellor apparently erred in basing his decision on Mrs. Carr's adultery, it was found that the ultimate custody decision was not manifestly in error or against the overwhelming weight of the evidence, and the trial court was affirmed.
Though the predominant issue in this case seems to have been Mrs. White's lesbian relationship, and the chancellor may have relied almost entirely on this, we find that a review of the entire record and the circumstances present, including the children's health and supervision and the atmosphere in which they were being brought up, shows that the chancellor's decision that Mrs. White was an unfit mother, morally and otherwise, was not against the overwhelming weight of the evidence. There was credible evidence, discounting the morality aspects of this case, that the children had not been properly supervised, and that they had not been adequately clothed or fed, and there had been a resulting deleterious effect on their health. A parent's chosen manner of living may not take precedence over the well-being of the children involved.
An White cites cases from other jurisdictions to the effect that homosexuality should not by itself prohibit a parent from getting custody. See Bezio v. Patenaude, 381 Mass. 563, 410 N.E.2d 1207 (1980); M.A.B. v. R.B., 134 Misc.2d 317, 510 N.Y.S.2d 960 (1986). Because we hold that the record supported the finding by the chancellor that An White was unfit, morally or otherwise, we do not reach the question of *1185 per se unfitness. This argument is without merit.

II.
The chancellor ordered that An White's visitation was to be exercised outside the presence of Phyllis Hasberger, and that Mrs. White could not remove her children from the state without written permission of the Thompsons. Mrs. White argues only about the first restriction and not the second. Any objection to the restriction on taking the children out of state was apparently waived.
Visitation and restrictions placed upon it are within the discretion of the chancery court. Newsom v. Newsom, 557 So.2d 511, 517 (Miss. 1990); Clark v. Myrick, 523 So.2d 79, 83 (Miss. 1988); Cheek v. Ricker, 431 So.2d 1139, 1146 (Miss. 1983). Visitation should be set up with the best interests of the children as the paramount consideration, keeping in mind the rights of the non-custodial parent and the objective that parent and child should have as close and loving a relationship as possible, despite the fact that they may not live in the same house. Clark, 523 So.2d at 83; Cox v. Moulds, 490 So.2d 866, 870 (Miss. 1986).
This is a question of first impression for this Court. Courts from other jurisdictions have found, and the majority rule appears to be that restricting visitation in this manner is a reasonable exercise of the court's power and discretion. See L. v. D., 630 S.W.2d 240 (Mo. Ct. App. 1982); Irish v. Irish, 102 Mich. App. 75, 300 N.W.2d 739 (1980); J.L.P.(H.) v. D.J.P., 643 S.W.2d 865 (Mo. Ct. App. 1982); In re J.S. & C., 129 N.J. Super. 486, 324 A.2d 90 (1974); In re Jane B., 85 Misc.2d 515, 380 N.Y.S.2d 848 (1976); DiStefano v. DiStefano, 60 A.D.2d 976, 401 N.Y.S.2d 636 (1978); see generally Annotation, Visitation Rights of Homosexual or Lesbian Parent, 36 A.L.R.4th 997 (1981). Considering this authority, and the discretion accorded to chancellors in these matters, we find that there was no abuse of discretion resulting from the restrictions placed on An White's right of visitation. This assignment is without merit, and the judgment of the chancery court is affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON and BLASS, JJ., concur.
ROBERTSON, J., dissents by separate written opinion.
ROBERTSON, Justice, dissenting:
Of course there is evidence that three and a half year old David and seventeen month old Joseph have been neglected, but no more than one would expect to find in any case where a twenty-four year old mother with but a high school diploma and no independent means has been in effect deserted by a drunken husband who has provided not a penny in support. The poor are much with us, and sadly many of these are young women with children and without support. I had not thought heretofore we regarded this grounds for taking these children from their mothers. See Robinson v. Robinson, 481 So.2d 855, 857 (Miss. 1986); Cook v. Conn, 267 So.2d 296, 298-99 (Miss. 1972); Simpson v. Rast, 258 So.2d 233, 236 (Miss. 1972). If the neglect found here is to become the standard, I dare say few of our economically disadvantaged citizens will find their children secure from grandparents who engage skilled counsel.
In point of fact An White's "neglect" played little, if any, part in motivating Elva and Edward Thompson to bring this action. Their concern was their objection to An's lesbian relationship with Phyllis Hasberger. I trust no one will seriously suggest this a per se basis for stripping An of custody of her two minor children. See S.N.E. v. R.L.B., 699 P.2d 875 (Alaska 1985); In re Marriage of Birdsall, 197 Cal. App.3d 1024, 1028, 243 Cal. Rptr. 287, 289 (1988); Nadler v. Superior Court, 255 Cal. App.2d 523, 525, 63 Cal. Rptr. 352, 354 (1967); D.H. v. J.H., 418 N.E.2d 286, 293 (Ind. Ct. App. 1981); Doe v. Doe, 16 Mass. App. Ct. 499, 503, 452 N.E.2d 293, 296 (1983); In re J.S. & C., 129 N.J. Super. 486, 489, 324 A.2d 90, 92 (Ch.Div. 1974), aff'd, *1186 142 N.J. Super. 499, 362 A.2d 54 (1976); Guinan v. Guinan, 102 A.D.2d 963, 964, 477 N.Y.S.2d 830, 831 (1984); Conkel v. Conkel, 31 Ohio App.3d 169, 509 N.E.2d 983, 985 (1987); see also In re Adoption of Charles B., 50 Ohio St.3d 88, 552 N.E.2d 884, 888 (1990) (homosexuality of father not per se grounds for denial of adoption); A. v. A., 15 Or. App. 353, 514 P.2d 358, 360 (1973); Constant A. v. Paul C.A., 344 Pa. Super. 49, 496 A.2d 1, 9 (1985); Stroman v. Williams, 291 S.C. 376, 379-80, 353 S.E.2d 704, 705-06 (Ct.App. 1987); Kallas v. Kallas, 614 P.2d 641, 645 (Utah 1980); Medeiros v. Medeiros, 8 Fam.L.Rep. (BNA) 2372 (Vt.Super.Ct. 1982); In re Marriage of Cabalquinto, 100 Wash.2d 325, 329, 669 P.2d 886, 888 (1983); Rowsey v. Rowsey, 329 S.E.2d 57, 60-61 (W. Va. 1985); see also In re Jacinta M., 107 N.M. 769, 764 P.2d 1327 (Ct.App. 1988) (dictum) (stating that the homosexuality of the child's brother was not sufficient alone to deny him custody); M.A.B. v. R.B., 134 Misc.2d 317, 510 N.Y.S.2d 960 (1986) (discussion of unsubstantiated societal biases associated with custody actions wherein homosexuals are parties, as well as the possible beneficial aspects of granting such custody in certain instances). At most it is a factor to be considered, and to inform adjudication only when there is a demonstrable present adverse affect upon the children or a substantial likelihood of such affect in the future. Such affect must be predicated upon positive proof and not prudish prejudice.
We have held on any number of occasions that sexual indiscretion on the part of a parent does not per se warrant a change in custody. See, e.g., Phillips v. Phillips, 555 So.2d 698, 701 (Miss. 1989); Kavanaugh v. Carraway, 435 So.2d 697 (Miss. 1983), and we have applied this principle as well to reverse a chancery court order granting custody to grandparents. Stoker v. Huggins, 471 So.2d 1228, 1229-30 (Miss. 1985). I see no basis in principle for distinguishing today's facts from these oft-stated premises.
It is important that An's estranged husband makes no claim to custody. His closet is filled with as many skeletons as hers, if not more. David White is a career drunk who, after An threw him out, took up with a live-in girlfriend of his own. His financial neglect of his children has been massive. Indeed, most of An's neglect is attributable to the employment she has been forced to pursue because of David's irresponsibility.
Our law exalts the best interests of children and appropriately so, but we have no law which allows a grandmother and step-grandfather to obtain custody of children by reference to the conventional reading of that standard. For one thing, grandparents have no right of visitation in the absence of statute, Matter Of Adoption Of A Minor, 558 So.2d 854, 856 (Miss. 1990); see also Muse v. Hutchins, 559 So.2d 1031, 1033-35 (Miss. 1990). For better or for worse, they have no right of custody, as we have no statute providing such. These premises are reflected in the frequent statements in our cases that in custody contests between a parent (or parents) and grandparents, the parent(s) prevail absent a showing that they are totally unfit. See Milam v. Milam, 509 So.2d 864, 866 (Miss. 1987); Rutland v. Pridgen, 493 So.2d 952, 954-55 (Miss. 1986); Owens By and Through Mosley v. Huffman, 481 So.2d 231, 242 (Miss. 1985); Stoker v. Huggins, 471 So.2d 1228, 1229 (Miss. 1985); Thomas v. Purvis, 384 So.2d 610, 612-13 (Miss. 1980); Pace v. Barrett, 205 So.2d 647, 649 (Miss. 1968).
We need to be clear about this last point. Our law presumes (albeit rebuttably) the best interests of children will be preserved by their remaining with their natural parents, e.g., Milam v. Milam, 509 So.2d 864, 866 (Miss. 1987), and, if they cannot be with both, then the presumption is relaxed only to the point that they should remain with a natural parent. Grandparents demanding custody are held to the same standard as public welfare authorities, that is, they must show by clear and convincing evidence that the theretofore custodial parent (1) has abandoned the child or (2) practices gross and depraved immorality to the demonstrable detriment of the child or (3) is mentally or otherwise unfit to have custody. Luttrell v. Kneisley, 427 So.2d 1384, *1187 1387 (Miss. 1983); De La Oliva v. Lowndes County Department of Public Welfare, 423 So.2d 1328, 1331 (Miss. 1983); Natural Father v. United Methodist Children's Home, 418 So.2d 807, 811 (Miss. 1982). Even so, grandparents may not acquire custody as of right but are the recipients of such custody as a court may order because children of wholly unfit parents must be placed somewhere.
I have read this record and do not find proof even approaching these standards. If Phyllis Hasberger were a man to whom An was married and, if the facts of this case were otherwise wholly identical, I dare say that no court would dream of placing custody with these children's grandmother and step-grandfather.
When on appeal we review findings of ultimate fact, we enforce the familiar substantial evidence/clearly erroneous test, and it quite limits our scope of review. We enforce this limitation, however, only where the fact finder has applied the correct legal standard. See Dycus v. Sillers, 557 So.2d 486, 503 (Miss. 1990); Leatherwood v. State, 539 So.2d 1378, 1387 (Miss. 1989); Woodward v. State, 533 So.2d 418, 427 (Miss. 1988); Watts v. State, 492 So.2d 1281, 1289 (Miss. 1986). Where, as here, the trial court has applied an erroneous legal standard, we do not hesitate to reverse. Detroit Marine Engineering v. McRee, 510 So.2d 462, 467 (Miss. 1987); Bell v. City of Bay St. Louis, 467 So.2d 657, 661 (Miss. 1985). Apropos of today's case, we have held we must reverse where the law has imposed a "clear and convincing" quantum of proof standard and where the court below has failed to enforce that standard. McClendon v. State, 539 So.2d 1375, 1377-78 (Miss. 1989); McGory v. Allstate Insurance Co., 527 So.2d 632, 638 (Miss. 1988).
It is clear to my mind that the Court below  accepting at face value that Court's stated view of the case  applied incorrect substantive standards as well. The test is abandonment, not neglect. No evidence before us suggests An abandoned her children. The test for unfitness is moral depravity, not unconventionality, and in any event actual or probable substantial adverse impact must be shown. The Court below  and today's majority as well  apply standards of fitness and effect far more relaxed than our law demands. I see no evidence remotely suggesting An's conduct has the actual or potential effect our law deems necessary to take her children from her. What evidence there may be is certainly not clear and convincing. See also, Phillips v. Phillips, 555 So.2d at 703-04.
I would reverse.