McRAE, Presiding Justice,
Dissenting:
¶ 70. I dissent as to the majority’s findings on jurisdiction, notice to the father, revocation of consent, and the best interest of the child. The Chancery Court of Clarke County, Mississippi did not have jurisdiction of this adoption matter. The child’s father was not given adequate notice of the adoption proceeding. Additionally, the mother’s signing of the adoption papers did not legally relinquish her rights because of her status as a minor and because the adoptive parents exerted undue influence over her. And lastly, the chancery court erred by not giving valid consideration to the best interest of the child.
¶ 71. First, the Chancery Court of Clarke County, Mississippi, did not have jurisdiction over this adoption proceeding. Since the majority’s version of this issue is so complicated and convoluted, I will attempt to get straight to the point. The majority’s holding provides Mississippi courts with unlimited jurisdiction when it comes to adoption. The mother and daughter were in Mississippi on a short vacation to see her father. They had only been here three months and had no intent to stay here. Despite these facts, the majority finds that the Chancery Court of Clarke County, Mississippi had jurisdiction to hear this adoption matter. This is outrageous. Even custody matters in Mississippi require some sort of residency or domicile requirement. See Miss.Code Ann. §§ 93-23-3 & 93-23-5 (Rev.1994). Furthermore, Arizona is the appropriate forum for such a proceeding since Arizona is the domicile of the mother and child. Also, the whole abandonment argument made by the majority in an attempt to justify Mississippi’s jurisdiction over this matter is absurd. The majority finds that the mother’s single act of signing the adoption papers constituted abandonment. The Court of Appeals has found that:
[Abandonment is “any course of conduct on the part of a parent evincing a settled purpose to forgo all duties and relinquish all parental claims to the *717 child.” Ethredge v. Yawn, 605 So.2d 761, 764 (Miss.1992). Abandonment “may result from a single decision” or “may arise from a course of circumstances.” Ethredge, 605 So.2d at 764. A court should objectively determine “wether under the totality of the circumstances, be they single or multiple, the natural parent has manifested his severance of all ties with the child” Id. Finally, “abandonment must be proven by clear and convincing evidence.” Id.
Hill v. Mitchell, 818 So.2d 1221, 1224 (Miss.Ct.App.2002) (emphasis added). The facts show that the adoptive parents all but held the mother’s hand while she signed the papers. They used every manipulative tactic available to convince the mother, a seventeen-year-old child herself, that she should allow them to adopt her child. Their coercion and underhandedness are obvious; therefore the majority’s abandonment argument is without merit since the totality of the circumstances does not evidence voluntary abandonment.
¶ 72. Second, the adopted child’s father was not given adequate notice of the adoption proceeding. Despite this Court’s contrary holding in Humphrey v. Pannell, 710 So.2d 392 (Miss.1998), I believe that under the circumstances of this case, the natural father was entitled to notice. Had the parties to the adoption been unaware of the natural father’s name and location, the failure to serve him with notice of the proceedings may have been justified. But under these facts; where the natural father’s name and location are known; notice should have been served. The record shows that the father has had very little contact with the adoptive child since her birth, but some contact is more than none. X find it unconscionable to terminate a father’s parental rights without providing him proper notice. Especially under the circumstances were here the father has had contact with the child within the last couple of months. Imagine his shock when three months after having contact with his child he learns that the courts of our state have ordered her adoption without providing him notice. Last he heard his daughter was going to Mississippi on vacation to see her grandfather. Then all of a sudden he hears that she has been adopted by a family here in Mississippi. It is appalling to me that the trial court and the majority have terminated a parent’s rights in such a manner.
¶ 73. Third, the minor mother did not have capacity to execute the papers to relinquish her rights. It is well-established law in Mississippi that minors have limited contract rights and are not able to waive constitutionally protected rights even in civil litigation. See, Alack v. Phelps, 230 So.2d 789 (Miss.1970); Price v. Crone, 44 Miss. 571 (1870). By law, minors are restricted in their contract rights and liability. See Johnson Motors, Inc. v. Coleman, 232 So.2d 716 (Miss.1970); Shemper v. Hancock Bank, 206 Miss. 775, 40 So.2d 742 (1949); Edmunds v. Mister, 58 Miss. 765 (1881). In civil and criminal litigation, a minor’s right to waive the protection of certain liberties and constitutional rights are so too limited. In fact, this Court has stated: “[Mjinors can waive nothing. In the law they are helpless, so much so that their representatives can waive nothing for them.” Khoury v. Saik, 203 Miss. 155, 162-63, 33 So.2d 616, 618 (1948). Yet, here this Court allows a seventeen-year-old girl to consent to an adoption without the advice of counsel or her guardian; i.e. her mother. Furthermore, when the minor mother went to sign the adoption papers she was told she could not leave the lawyer’s office with the papers to look them over and the attorney who prepared the papers was not available for questions regarding their content. Could *718 it be any clearer that this girl was being taken advantage of and did not have had the mental capacity and knowledge to consent to the adoption?
¶ 74. Furthermore, the adoptive parents exerted undue influence upon her which should make such document execution non-consensual. This Court has found that in order for a natural parent to defeat a finding of consensual surrender of their child when they sign adoption documents, the parents “must either establish fraud, duress, or undue influence.” In re Adoption of 796 So.2d 975, 979 (Miss.2001) (citing C.C.I. v. Natural Parents, 398 So.2d 220, 226 (Miss.1981)). This Court has stated that “undue influence cannot be predicated of any act unless free agency is destroyed, and that influence exerted by means of advice, arguments, persuasion, solicitation, suggestion, or entreaty is not undue, unless it be so importunate and persistent, or otherwise so operate, as to subdue and subordinate the will and take away its free agency.” Id. at 981 (quoting C.C.I., 398 So.2d at 226; Burnett v. Smith, 93 Miss. 566, 571, 47 So. 117 (1908)). Additionally, this Court has stated:
Several of the means which may constitute undue influence include over-persuasion, threat of economic detriment or promise of economic benefit, the invoking of extreme family hostility both to the child and mother, and undue moral persuasion. Because undue influence is such a broad concept, cases must be resolved upon their particular facts.
Id. (quoting C.C.I., 398 So.2d at 222-23). “[WJhether consent may be withdrawn is to be determined on a ‘case by case basis ... always keeping in mind that the best interest of the child is paramount.’ ” In re Adoption of P.B.H., 787 So.2d 1268, 1272 (Miss.2001) (quoting Grafe v. Olds, 556 So.2d 690, 696 (Miss.1990)). After reviewing the facts of this action, it is apparent that the adoptive parents exerted undue influence over the mother. The majority omits many facts regarding this action. In December 2000, the mother brought the child with her to Mississippi to visit her father and his live in girlfriend who is the mother of the adopting mother. During their visit, the adopting parents began showing a great deal of affection toward both the mother and child. They suggested that the girls move in with them for a while until they returned to Arizona. During the first week of her living with them, the adoptive parents began making comments about how they were unable to have children and were trying desperately to adopt. • The adoptive mother often came to the mother crying about her inability to have a child or adopt. They treated the mother and child like daughters and often encouraged the mother to go out with friends. In fact they began giving the mother spending money for that very purpose. Less than one month after meeting them, the adoptive parents encouraged the mother to end the guardianship of the child by her maternal grandmother. They drafted the paperwork and paid for the proceedings to end guardianship. Then the adoptive parents took their final step only after three (3) months of knowing the mother and child. Through coercion and manipulation, they convinced the mother that she should sign papers allowing the child to be adopted by them. They even promised her that she had six months to change her mind and that if the adoption went through she would be able to spend as much time with the child as she liked. Their attorney drew up the paperwork and had the mother sign the documents without even explaining their significance or advising her to get counsel. Less than a week after the papers were signed the mother realized their significance. She went to the adoptive mother and told her that she did not want to give her child up *719 for adoption. There could not be a more clear cut case of undue influence and coercion. The adoptive parents preyed on an innocent and uneducated teenager. They even had an inside track. The mother of the adoptive mother was the live in girlfriend of the child’s mother’s father who undoubtedly played a role in convincing the child’s mother that adoption was the right thing to do.
¶ 75. While the majority’s reliance on Grafe is not misplaced, it fails to realize the complete holding of this Court. In Grafe, this Court found that a natural mother who voluntarily executed instruments consenting to the adoption of her child was not entitled to revoke that consent absent duress, fraud, intimidation, or undue influence. 556 So.2d at 694-95. However, the Court went on to state that:
In so holding, however, we do not mean to pronounce that consent may never be withdrawn. We emphasize that such a determination must be made on a case by case basis in timely fashion without unnecessary delay in the proceedings, always keeping in mind that the best interest of the child is paramount.
Id. at 696 (emphasis added). It is clear that the holding in Grafe contemplated that there would be situations; such as the one at hand; where revocation of consent is warranted and certainly in the best interest of the child.
¶ 76. Fourth, the majority fails to give appropriate consideration for the best interest of the child. Mississippi has consistently and repeatedly held that “the best interest of the child is a polestar consideration in the granting of any adoption.” In re Adoption of D.T.H., 748 So.2d 853, 855 (Miss.Ct.App.1999) (In re Adoption of J.J.G., 736 So.2d 1037, 1038 (Miss.1999)) (citing Muse v. Hutchins, 559 So.2d 1031, 1035 (Miss.1990)); See Dep’t of Human Services v. Smith, 627 So.2d 352, 353 (Miss.1993). “Factors to be considered in determining the child’s best interest are stability of environment, ties between prospective adopting parents and children, moral fitness of parents, home, school and community record of the child.” P.B.H., 787 So.2d at 1274 (quoting Natural Mother v. Paternal Aunt, 583 So.2d 614, 619 (Miss.1991)). Furthermore, “[i]n an adoption proceeding, on the threshold, the court is met with the presumption that the child’s parents will love him most and care for him best, and that, ordinarily, it would be for the best interests of the child that he remain in the custody of his parents.” Ford v. Litton, 211 So.2d 871, 873 (Miss.1968). Here, the child was one year and four months (16 months) old when she and her mother came to Mississippi to visit her grandfather. Children at this age are very attached to their parents. Their only security in life are those who have cared for them since birth. The child only knew the adoptive parents for three months before they filed their complaint for adoption. Only ten months after the child met the adoptive parents, the Chancery Court of Clarke County, Mississippi entered an order granting the adoption. There is no way the child could have known the adoptive parents well enough to be emotionally stable with her adoption and placement with them. The child had only two persons close to her: her mother and her maternal grandmother. It can not be in the best interest of this child to allow this adoption. Furthermore, the majority seems to emphasize on the mother’s personal life as a reason why it would be in the best interest of the child to be adopted, but her personal decisions do not justify its findings. After all, this Court has always ruled that a parent’s personal choices which are not in view of their child and that have no negative impact on their child rearing are not sufficient for a finding that it would not be in the child’s best interest *720 to be placed on remain with the parent. See In re J.D., 512 So.2d 684, 686 (Miss.1987); Kavanaugh v. Carraway, 435 So.2d 697, 701 (Miss.1983); In re Yarber, 341 So.2d 108, 109-10 (Miss.1977); Mayfield v. Braund, 217 Miss. 514, 525, 64 So.2d 713, 717 (1953). In sum,
Since the beginning of jurisprudence in this state, the law and courts have jealously guarded the rights of parents to their children and are not to have them taken away by others. This is true whether the parents be high or low, rich or poor, educated or ignorant, wise or foolish.
Ainsworth v. Natural Father, 414 So.2d 417, 421 (Miss.1982) (Lee, Roy Noble, J., dissenting.)
¶ 77. For these reasons, I respectfully dissent.
DIAZ, J., JOINS THIS OPINION.